PATRICK S. SMITH, ESQ., State Bar No. 120220
BELTRAN, BELTRAN, SMITH & MACKENZIE LLP
16133 Ventura Blvd., Suite 1145
Encino, California 91436
Telephone: (818) 981-1027
Facsimile: (844) 270-8055
patricksmithlaw@gmail.com

Attorney for Plaintiff
VERNON STRATTON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERNON STRATTON | ) CV 2:19-cv-00430 MCS (ASx) |
| Plaintiff, | ) MEMORANDUM OF CONTENTIONS<br>) OF FACT AND LAW |
| vs. | ) |
| CITY OF LOS ANGELES, OFFICER<br>GONZALEZ (#42365), OFFICER<br>SANCHEZ (#32899), OFFICER<br>AMBER KIM (#40907), TRAVIS<br>HANTSBARGER, DONNA BRITTON,<br>and DOES 1- 100, inclusive, | ) Pretrial Conference:<br>) Date: October 30, 2020<br>) Time: 10:00 a.m.<br>) Ctrm: First Street Courtroom 7C<br>)<br>) Trial: November 17, 2020<br>) Time: 9:00 a.m. |
| Defendants. | )<br>) |

Plaintiff hereby files his Memorandum of Contentions of Facts and Law.

DATED: October 9, 2020          BELTRAN, BELTRAN, SMITH &
                                MACKENZIE LLP


                                By:   /S/
                                PATRICK S. SMITH
                                Attorneys for Plaintiff

**TABLE OF CONTENTS**

**<u>MEMORANDUM OF CONTENTIONS OF FACT AND LAW</u>**

I.      INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.     STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

      A.     The Police Contact Prior to the Events.. . . . . . . . . . . . . . . . . . . . . . . .   1

      B.     The Entry Into the Backyard Where Defendant was Beaten by the
            Defendants Hantsbarger and Britton. . . . . . . . . . . . . . . . . . . . . . . .   2

PLAINTIFFS' CLAIMS OF LIABILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

PLAINTIFFS' DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

ISSUES OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

      1.     PLAINTIFF HAS ALLEGED THAT NO PROBABLE CAUSE
          EXISTED  TO ARREST PLAINTIFF AND THAT FRAUD WAS
          COMMITTED BY THE DEFENDANTS TO OBTAIN THE
          PROBABLE CAUSE ORDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

            A.     The Starting Point for a the Determination of Probable Cause
                is Franks v. Delaware and the Alleged Material
                Misrepresentations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

            B.     Defendants Presented Purportedly Factual Information to the
                Magistrate Which Plaintiff Alleges Contained Material
                Misrepresentations and Omissions, i.e., Fraud... . . . . . . . . . . . .   15

            C.     There Existed No independent Investigation by the District
                Attorney's Office into the Allegations of Corroboration.... . . . . .   17

      2.     IMPORTANT FACTS OF THE FRAUD PERPETRATED ON THE
          COURT AND THE PROSECUTOR BY THESE DEFENDANTS. . .   17

            A.     The Fraud Perpetrated on the Prosecution and Court by These
                Defendants Comes Under the Fraud Exception and Denied
                Plaintiff A Full And Fair Hearing... . . . . . . . . . . . . . . . . . . . .   17

            B.     The Fraud Perpetrated on the Prosecution and Court by These
                Defendants Was Not Litigated at the Preliminary Hearing Because
                the Fraud Was Hidden from the Defense, the Prosecution and the
                Court.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

            C.     The Trial Court Ultimately Dismissed the Finding of Probable
                 Cause When It Granted the Prosecution's Motion to Dismiss....   19

      3.     THE DEFENDANTS ENGAGED IN MALICIOUS PROSECUTION
          IN VIOLATION OF THE PLAINTIFF'S CIVIL RIGHTS. . . . . . . . .   19

4.      THE STATE LAW CLAIMS ARE SUPPORTED BY THE
        EVIDENCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

EVIDENTIARY PROBLEMS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

BIFURCATION OF ISSUES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

JURY TRIAL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ATTORNEYS' FEES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1

# TABLE OF AUTHORITIES

**CASES:**

*Allen v. McCurry*, 449 U.S. 90, 95 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Bergquist v. County of Cochise*, 806 F.2d 1364 (9th Cir.1986). . . . . . . . . . . . . . . .   14

*Branch v. Tunnell*, 937 F.2d 1382 (9th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bretz v. Kelman* 773 F.2d 1026 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dunaway v. New York* 442 U.S. 200, 99 S.Ct. 2248 (1979). . . . . . . . . . . . . . . . . . .   13

*Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).. . . . .   13, 16

*Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*Haupt v. Dillard*, 17 F.3d 285 (9th Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Kennedy v. L.A.P.D.* 887 F.2d 920 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kraus v. County of Pierce* 793 F.2d 1105 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . 13

*Liston v. County of Riverside*, 120 F.3d 965, 974 (9th Cir.1997) . . . . . . . . . . . . . . 14

*Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986). . . . . . . . . . . . . . . .   14, 15

*McCutchen v. City of Montclair*, 73 Cal. App. 4th 1138 (1999). . . . . . . . . . . . . . . .   18

*Mendocino Enviro. Ctr. v. Mendocino Co.*, 192 F.3d 1283 (9th Cir.1999).. . . . .   13, 14

*Terry v. Ohio* 392 U.S. 1, 21-22, 88 S.Ct. 1968, 1879, 1880 (1968). . . . . . . . . . . .   12

*U.S. v. Robertson* 83 F.2d 777 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

*Usher v. City of Los Angeles* 828 F.2d 556 (9th Cir. 1987). . . . . . . . . . . . . . . . . . .   21

**STATUTES:**

California Penal Code § 17(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 9

California Penal Code § 245. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 9

California Penal Code § 602(m). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 9

California Penal Code § 602(o). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

California Penal Code Section 836. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

42 USC § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8, 12

**OTHER**

Judicial Council Of California Criminal Jury Instruction 875. . . . . . . . . . . . . . . . .   7

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF CONTENTIONS OF FACT AND LAW

**I.   INTRODUCTION**.

The facts are relatively straightforward in this case, but were complicated, confused, and distorted by the testimony of the Los Angeles Police Department Officer in this case.   The testimony of the Officer was proven false in the middle of the Preliminary Hearing by reference to the Body Worn Video (BWV).  The testimony of the officer so distorted the true facts of the case that Defendant was denied Due Process and subject to false arrest and malicious prosecution in violation of his civil rights..

The Plaintiff was beaten by the civilian defendants so badly he suffered multiple broken bones (skull, facial, teeth, leg (two bones), and wrist).  He had to have multiple surgeries.  Neither of the defendants was touched, much less injured.

**III.   STATEMENT OF FACTS**

**A.   The Police Contact Prior to the Events**.

On or around 10:15-10:30 p.m., on April 12, 2018, Brandon Puda was at home with his roommate, Defendant, Vernon Stratton.   Preliminary Hearing Transcript[1] ("PHT") 45:16-46:6. They live in a single family home with multiple bedrooms and a large back yard in the Canoga Park area of the San Fernando Valley. Brandon had been at the house working the entire day doing "audio work" in his home studio.  PHT 46:4-20. At approximately 10 p.m., Brandon went into the backyard and sat at the patio furniture; for a short time he talked and hung out with Defendant.[2]  PHT 46:21-23. While they were seated, Brandon and Vernon heard a child scream coming from a neighbor's property which was "diagonally" behind them.  PHT 46:24-47:7.  Both Brandon and Vernon "got up from [their] seat[s]" and walked to the fence to listen.  PHT 47:8-11.

---

[1]The Preliminary Hearing Transcript is identified as an Exhibit and the testimony therein is made by parties to this action.  To the extent that witness testimony is contained therein, it is not hearsay to the extent it is impeachment or prior testimony, in much the same way a deposition is used.

[2]Plaintiff, Vernon Stratton, has custody of his 8 year-old daughter and she was asleep inside the residence.  PHT 53:1-5.

---

The scream so alarmed them that Brandon called 911, and he and Vernon stood their "and waited, listening." PHT 47:12-17. LAPD Officer Montoya and her partner responded to the call.[3] The officers entered the home and went into the back yard at the residents' invitation. Brandon and Vernon "pointed and showed them where the scream came from." The LAPD officers, Brandon, and Vernon discussed the scream, and the officers then left to talk to the neighbors next door, even though that may have not been the area from where the scream originated. Afterward, the officers returned to talk to Brandon and Vernon. PHT 47:20-28. The officers provided an explanation, but Brandon was not really satisfied because it was not clear to them that the officers found the child. PHT 47:29-48:20; 37:8-17.[4] The Officers left and Brandon and Vernon returned to their seats in the back yard. PHT 48:21-26. Brandon and Vernon sat in the backyard discussing the events when they again heard screaming – this time, though, they heard an "initial scream, and then [] another two screams after that but lower in volume, more muffled." PHT 48:28-49:5. This alarmed them even more.

## B.     The Entry Into the Backyard Where Defendant was Beaten by the Defendants Hantsbarger and Britton.

After hearing the second set of three screams, the latter two of which were muffled, Brandon and Vernon became concerned. Unfortunately, they did not call 911, because the police had "just left ten minutes prior." The two went to the back corner area of the yard – an area which is part of a "large back yard" where there are " a lot of trees and [is] secluded. PHT 50:10-19. Both looked over the fence and "saw like four or five

---

[3]Officer Montoya did not testify at the Preliminary Hearing although she was under subpoena. She had her child's kindergarten graduation that morning, so counsel released her from the subpoena on the condition that she be interviewed by Officer Joe Garcia who then testified as to her observations under Proposition 115.

[4]This 911 call and the events surrounding it, as described by Brandon Puda, were confirmed by the (Proposition 115) testimony of Officer Montoya. PHT 34:22-41:5. In other words, there really was a child screaming and Officer Montoya found evidence of it, although they did not make that clear to Brandon and Defendant. PHT 37:25-38:9.

---

sheds sitting over there and that is exactly where the screams came from. PHT 49:4-14.[5] Vernon went to his room and changed out of his pajamas and came to the back fence with a bat.[6]  Vernon climbed over the fence looking for the child [PHT 63:3-5]. Brandon retrieved a ladder and was looking over the fence and observed Vernon looking for the child.  PHT 51:3-8.  Vernon took a digital photograph on his phone of the inside of one sheds and showed it to Brandon.  The photograph showed a shed with a made bed and some filing cabinets.  This concerned Brandon, and, by definition, Vernon.  PHT 51:12-21.  Brandon observed Vernon continue to look for the child; he ventured further into the yard and into the neighbors' yard where the events at issue took place.  Unfortunately, Brandon could not see the relevant events because of the distance, the obstruction of the shed and trees, and the darkness (there was no moon).  It was also very windy with the tress amplifying the noise of the wind. PHT 51:22-52:17.[7]

When Vernon entered the back yard of Donna Britton, he was shining his flashlight in the house and in the back yard looking for the source of the child's screams. The home, unfortunately, is unkept both in and out, and appeared to be unoccupied except for stored items. Donna Britton was in the home and, not knowing what was happening, called her neighbor to come over to see who was in her back yard.  The neighbor, Travis Hantsbarger (the "victim") eventually entered the yard.  PHT 3:8-6:6. Donna Britton did not see the "altercation" between Travis Hantsbarger and Vernon Stratton.  It was dark and as soon as she saw Vernon get up, "[a]t which case, I left. I turned around and went back up my steps in to the house, locked the door, and called

---

[5]This area of the large backyard was an overgrown area which was not occupied or frequented by Vernon or Brandon.

[6]He also, unwittingly, put on a holster with a 1950's non-working, jammed, and rusted gun because of his concern for the child.  PHT 61:17-20.  The testimony was that the gun was inoperable, but the court found that the gun was irrelevant to the charges in this case, as none of the charges involve the gun.  PHT 19:6-21.

[7]The cross-examination by the DA only confirmed Brandon Puda's testimony, which the court found to be credible.

911.  PHT 6:14-21.

According to Officer Gonzales, Travis Hantsbarger told him that his neighbor (Donna Britton) called him sounding scared about the person in her back yard.[8]  He lived next door; he walked over to the fence, looked over, and saw nothing.  PHT 13:10-23.  Then he went back inside and retrieved a putter and went to Donna Britton's gate.  PHT 13:24-26.  Prior to unlocking the gate he announced himself and got no response.  PHT 13:27-14:7; (see also, PHT 22:6-25:3 where the officer was corrected on the fact that Hantsbarger did not call out while he was in the yard).

Gonzalez then testified that Travis Hantsbarger told the officer that he walked into the yard and "there was a male crouched in the corner with a baseball bat. He stated that this male jumped up at him with a bat, taking a batting stance – striking stance."  This testimony is false.[9]  Officer Gonzalez was asked to describe in detail what Hantsbarger told him.  Officer Gonzales testified: "He was crouched down on the ground, kind of huddled in a fetal position.  As Travis makes his way around the corner, this unknown male allegedly jumps up at him and takes "pretty much" a batting stance with the bat.  PHT 14:23-27.[10]  The court asked Officer Gonzales:

> THE COURT:  Just so I am clear, it appears from what you're telling me, Travis told you that he has got the putter.  He encounters this unknown male. The unknown male goes in to a crouch, holding a bat like he is going to be struck.
>
> THE WITNESS: Batting stance.

PHT 17:6-11.[11]  Officer Gonzales admits that <u>no where</u> in his report did her ever write

---

[8]The back yard is also unkept, overgrown with deep weeds and unpruned trees.  This can be seen in the BWV.

[9]As will be seen from the video and audio interview of Travis Hantsbarger that evening, Hantsbarger never said any such thing.  Hantsbarger said that he saw Vernon Stratton on the ground and he got up saying something about a child.  PHT, *infra.*

[10]Again, this testimony about what Travis Hantsbarger said was false.  Hantsbarger never said Vernon took a batting stance.  He said, I though he was going to go for the bat (which wasn't even in Vernon's hands), so I hit him.  PHT, *infra.*

[11]Again, this is totally false.

---

1    that Travis Hantsbarger stated that Vernon Stratton jumped up and took a "batting stance"

2    with the bat in preparation to strike or threaten Travis Hantsbarger.  PHT 27:10-28:13.[12]

3        Travis Hantsbarger was nervous and struck Vernon before Vernon could finish

4    explaining why he was there.  Hantsbarger struck Vernon because Hantsbarger was

5    scared, and maybe justifiably so, BUT NOT because Vernon got into a batting stance or

6    threatened Hantsbarger with the bat.  When Hantsbarger went into the back yard, he was

7    prepared to confront someone and that is why he brought the putter.  PHT 29:24-30:2.

8    Travis was edgy and nervous when he entered the back yard.  PHT 30:3-5.

9        Travis Hantsbarger's interview was played for the court, specifically related to the

10    contact between him and Vernon Stratton.  The video/audio interview, Marked as Defense

11    Exhibit A was admitted into evidence by reference.  The Transcript of the interview was

12    admitted into Evidence as Defense Exhibit B.[13]  The video is attached in DVD format.

13    The transcript is set forth below.

14        In the video, Hantsbarger states that Vernon said something about a child

15    screaming, but he disregarded the statement, saying there are no children here.  Further,

16    Vernon is heard throughout the video stating, while lying on the ground with a fractured

17    skull, broken facial bones, broken teeth, broken arm and broken leg, that he was there

18    looking for a screaming child.

19        As for the contact between Vernon Stratton and Travis Hantsbarger, the verbatim

20    video/audio interview between Travis Hantsbarger and the LAPD is as follows:

21       24:10 [VERBATIM]

22       Hantsbarger:       I walked in the back, and I nearly stepped
23       on him. He's laying, he's laying right there down underneath
her windows.  And um, he jumps up. I shine the flashlight on
him; **He goes for the bat, and I hit him with the golf club**.  I

24

25

26    [12]Respectfully, during this cross-examination, the court continually interfered with counsel's cross-examination of the witness continually attempting to establish with the officer that Vernon "jumped up and took a batting stance."  PHT 25:4-28:20.

27

28    [13]The actual audio/video recording is the item in evidence and is provided to the court.  The transcript herein is provided in the text of this Memorandum to assist the court.

1    don't'....

2    LAPD Gonzalez:    OK So did he get a chance to bring it up at
     all?
3
     Hantsbarger:        yeah. . . .he tried, he tried, **he grabbed and**
4    **tried to bring it up.**  I hit him with it and he dropped it.

5    BWV/LAPD Gonzalez:   But,  **Did he actually get up here**
     **with it?**
6
     Hantsbarger:   _____**I don't,   No.  I don't think so. I don't**
7    **remember.**

8    LAPD Gonzalez:   He just gots to grab it.

9    Hantsbarger:        I saw a gun on his hip

10   LAPD Gonzalez:    And you saw the holster

11   Hantsbarger:        and then **I saw him with a bat and I'm**
     **thinking he's gonna fucking club me and he's going to shoot**
12   **me and kill me.**

13   BWV/LAPD Gonzalez:    Uh huh.

14   Hantsbarger:        So I hit him, I hit him with, with, with the,
     with  my weapon...with my golf club.
15
     LAPD Gonzalez:    Ok. Yeah yeah
16
     Hantsbarger:        And um
17
     LAPD Gonzalez:    He fell
18
         Hantsbarger:        He drops the bat and I pick the bat up
19   and I tell him to get on the knees, "My god you hit me, you hit
     me, I'm like, yeah you hit me;"  And I was like "you have a
20   gun" and I was like "get on the ground; get on the ground
     now." And he's not listening to me. He keeps trying to go for
21   his ... **I feel like he's going for his gun.**

22   LAPD Gonzalez:    Uh Huh.

23   Hantsbarger:        No matter what, every time, and every time
     he does that I kind a get louder and I yell at him and he kind of
24   stops for a second.

25   LAPD Gonzalez:    OK

26   Hantsbarger:        And finally he just, he, **it looked like he's**
     **going for it and I just, I hit him with his own bat**. . .
27
     LAPD Gonzalez:    Do you know where the bat. . .Do ya know.
28   . .

| | |
|---|---|
| Hantsbarger: | . . .that I picked up |
| LAPD Gonzalez: | . . .where'd you hit him with the bat? |
| Hantsbarger: | I don't know. I hit, I just |
| LAPD Gonzalez: | In his head? |
| Hantsbarger: | I just ..I swung I ju..don't remember |
| LAPD Gonzalez: | Ok I just.. Cool |
| Hantsbarger: | And um, and ah the gun fell. And, and kicked over to the side |
| LAPD Gonzalez: | So you kicked it out to the side? |
| Hantsbarger: | it just fell and I saw it in the holster. |

PHT 32:20-34:9.  The video/audio was authenticated by Officer. Id.

Nowhere does Vernon, according to Travis Hantsbarger, do "an act that by its nature would directly and probably result in the application of force to a person." Judicial Council Of California Criminal Jury Instruction 875. The video establishes that Vernon had a bat and a gun, but that he never used them in a manner to attack Travis Hantsbarger such that a reasonable juror could say that the "direct and probable result" would be the "application of force" on Hantsbarger.

The court found that the trespass was not, as a matter of law, a viable charge, because Vernon was in the yard searching for a distressed and potentially endangered child.  As Defendant Officer Gonzalez notes on the video; "This appears to be a big misunderstanding." Video at 9 mins:30 secs.

The Complaint in the criminal case alleged two (2) counts against this defendant – violations of Penal Code § 245 (Assault with a Deadly Weapon) and Penal § 602(m).. The court dismissed the trespassing charge against Defendant as being unsupported by the evidence. The court refused to amend the pleadings to add a violation of 602(o).  The court reduced to a misdemeanor, pursuant to Penal Code § 17(b),  the Assault with a Deadly Weapon charge the Defendant entered a not guilty plea to the charge.  The case was dismissed by the prosecutor and the court upon their own motion because of the lack

of sufficient evidence.

In detaining and/or arresting the plaintiff, these defendants did so without probable or legal cause to detain, arrest or charge plaintiff with any criminal violations.   The charges were maliciously brought as a pretext to cover up the defendant's illegal activity and to retaliate against Plaintiff. The defendants met and talked and coordinated their testimony to unlawfully prosecute Plaintiff.  Specifically, Plaintiff uncovered evidence that the defendants changed their testimony to mirror each others' in a way that is enough to prove a conspiracy to maliciously prosecute Plaintiff or, at the very least,, establishes that the defendants did not have any justification for beating him or for arresting and prosecuting him.

## PLAINTIFFS' CLAIMS OF LIABILITY

Plaintiffs' claims against Defendants are as follows (subsequent to the motions for summary adjudication):

1. Unlawful Detention, Arrest, and Imprisonment against all defendants (42 USC § 1983);

2. Malicious Prosecution in violation of civil rights against all defendants (42 USC § 1983);

3. Negligence, including Negligent Infliction of Emotional Distress against defendants Hantsbarger and Britton (State law Claim);

4. Intentional Infliction of emotional Distress against defendants Hantsbarger and Britton (State law claim);

5. Assault and Battery against defendants Hantsbarger and Britton (State law claim);

The claims for relief in this case include unlawful arrest and malicious prosecution claims against the individual law-enforcement (LAPD) defendants and their joint actors, Travis Hantsbarger and Donna Britton as well as state law claims for the tortious conduct of the individual non-law enforcement defendants.  The claims are generally two-fold. First, the individual defendants arrested Plaintiff without probable

cause for felony assault with a deadly weapon (ADW) and the misdemeanor trespassing charge. The ADW was reduced to a misdemeanor and ultimately dismissed on the merits on the argument, in part, that there existed no probable cause to support any allegation of ADW. Second, the two individual defendants beat Plaintiff with mace, a baseball bat, golf club, and shod feet.

On the civil rights claims, regardless of the probable cause finding on the misdemeanor, the allegations in the complaint, and the evidence, show Plaintiff is not asking the court to find legal error with the judgment of the state court, but to establish that the finding of the court was based on the fraud, material misrepresentations or omissions on the prosecutor and on the court by all of the defendants. Additionally, the conduct alleged against the defendants supports the claim for malicious prosecution and abuse of process under the Fourth Amendment. The defendants in this case perpetrated a fraud on the court and withheld information that they had coordinated their testimony. The original criminal Complaint in this case alleged two (2) counts against this Plaintiff – violations of Penal Code § 245 (Assault with a Deadly Weapon (ADW) – a bat) and Penal Code § 602(m). At the Preliminary earing, the magistrate dismissed the trespassing charge against Defendant since it was unsupported by the evidence. The court also refused to hold Plaintiff to answer on 1 felony ADW. The court reduced to a misdemeanor, pursuant to California Penal Code § 17(b), the ADW charge. The Defendant entered a not guilty plea to that charge. Thereafter, as confirmed in the docket sheet the case was dismissed in the interests of justice.

The facts are relatively straightforward in this case, but were complicated, confused, and distorted by the testimony of the Los Angeles Police Department Officer in this case. The testimony of the Officer (as to what the "victim" told him) was proven false in the middle of the Preliminary Hearing by reference to the Body Worn Video (BWV) recorded interview of the "victim." That does not mean that what was said on the BWV was true. Neither the officers nor the civilian witnesses testified truthfully, and Plaintiff learned that the testimony of the officers and the civilian witnesses was being

coordinated to falsely implicate Plaintiff. The testimony of the officer so distorted the true facts of the case that Defendant was denied Due Process and his right to be free from malicious prosecution and a full hearing at the Preliminary Hearing.

More importantly, however, the statement of the "victim" showed that no crime was committed. The "victim" in this case, according to his own statement, was never assaulted, attacked or otherwise threatened by Defendant with the bat – the alleged weapon. In other words, there was no "assault" in this case, much less with a deadly weapon. The communications between the City defendant police officers and Hantsbarger showed that these parties got together in court and were conspiring to provide false testimony against Plaintiff. This was not litigated at the hearing because the conspiracy and communications to place at and before the hearing and were not known until after the probable cause hearing was completed.

At the Preliminary Hearing and at the subsequent dismissal of the case, the judges determined that there existed no factual basis for the felony charge of Assault with a Deadly Weapon or the misdemeanor charge of trespass. These charges were not supported by the evidence at the hearing. Both charges were dismissed as not being supported by the evidence. The court, instead reduced the ADW to a misdemeanor. This order, it is alleged, was obtained based on the fraud of the parties to this action and then, the case was dismissed by the court on the motion of the prosecutor because of these factors.

Plaintiff is seeking redress for the fraudulent conduct of these defendants. As a matter of fact, the successful finding by the state court judge is favorable evidence of Plaintiff's claim that defendants' fraud successfully caused Plaintiff's injury and used him damage. Stratton contends and plans to prove that the defendants fraudulently obtained a probable cause order against him through material misrepresentations and omissions (lies, perpetrating knowing falsehoods, and deception) upon the prosecutor and the court. In the end, the prosecutor surrendered and dismissed the case.

The state law claims arise from the unnecessary and/or excessive beating of

Plaintiff by defendants Hantsbarger and Britton.  The facts are set forth in the First Amended Complaint.  On the night of April 12, 2018, Plaintiff called the police to report hearing a crying child who appeared to be a potential victim of some sort of criminal activity.  The police responded to the location and verified that there indeed was a crying child but that the police could do nothing about it.  Later, after the police left, Plaintiff and his roommate again heard the child crying in a manner that alarmed them.  Because the police said they could do nothing about it, Plaintiff and his roommate decided to investigate over the fence in the adjacent yards wherefrom the crying was coming.

Plaintiff, without trespassing, proceeded into the neighbors' yard looking for the person he believed was harming the child.  In an adjacent yard, Plaintiff encountered Defendants HANTSBARGER and BRITTON.  Initially, because of the darkness and windy night, Plaintiff thought that HANTSBARGER was a police officer also responding to the location.  Plaintiff laid down on the ground.  When approached, Plaintiff, thinking he was speaking to a police officer, informed HANTSBARGER that he was looking for a crying child.  Plaintiff cooperated with the instructions give to him by HANTSBARGER and BRITTON but was then brutally beaten, without reasonable justification.  Although, Plaintiff was carrying a small bat and holstered a none-working pistol 1950's pistol, he gave those up at the instruction of HANTSBARGER and BRITTON who disarmed Plaintiff by their instructions.

HANTSBARGER, then, proceeded to strike Plaintiff while BRITTON sprayed plaintiff with mace.  Plaintiff was beaten so badly that he sustained a fractured skull, bleeding in the brain, fractured facial bones and missing teeth, a broken right hand/arm, laceration to his upper lip requiring at least nine stitches, and comminuted fracture of the right ankle. He was required to have surgery to repair is broken skull, his fractured facial bones and teeth, and surgery to place a plate in his ankle area as a result of the serious injuries inflicted on him during the beating.  His arm and leg were placed in casts and he was heavily bandaged after the surgeries to his face, teeth, and skull.  He was hospitalized because of the injuries.

## PLAINTIFFS' DAMAGES

Plaintiffs itemized list of claimed damages include the following:

A.    General Damages:  As described above, plaintiff sustained emotional distress and pain and suffering as a result of the incident which includes the pain and suffering from the injuries he received.  He spent approximately two weeks in the jail hospital.  He was also in fear of being prosecuted for something he did not commit.

B.    Special Damages:  As of this date, Plaintiff has incurred medical bills of approximately $186,972.00; Ambulance Bill of $1542.00; Plaintiff also had $20,000 in legal fees, and had to post a $30,000 bail for his release from custody after having been jailed for 17 days.  He has lost earnings since the incident in the amount of approximately $225,000.00.

C.    Punitive Damages:  Punitive Damages would seem to be appropriate if Plaintiff can prove his claims, based on these facts.

## ISSUES OF LAW

**1.    PLAINTIFF HAS ALLEGED THAT NO PROBABLE CAUSE EXISTED  TO ARREST PLAINTIFF AND THAT FRAUD WAS COMMITTED BY THE DEFENDANTS TO OBTAIN THE PROBABLE CAUSE ORDER..**

Under 42 U.S.C. Section 1983, an individual officer acting under color of authority may not subject another to an a detention or arrest without, respectively, reasonable suspicion or probable cause.  Before an officer may seize or detain someone for investigative or other purposes, you must have reasonable belief that such action taken was appropriate or is appropriate.  Such belief must be supported by specific and articulable facts that the seizure or detention is warranted.  The hunch, guess, or conjecture of an officer is not enough.  *Terry v. Ohio* 392 U.S. 1, 21-22, 88 S.Ct. 1968, 1879, 1880 (1968).  A detention or investigation, which is short of an arrest, must be limited to a brief stop and interrogation which focuses on the reason for

the stop.  If more than a brief stop occurs, then an arrest occurs.  U.S. v. Robertson 83 F.2d 777 (9ᵗʰ Cir. 1987); *Kraus v. County of Pierce* 793 F.2d 1105 (9ᵗʰ Cir. 1986); *Kennedy v. L.A.P.D.* 887 F.2d 920 (9ᵗʰ Cir. 1989).  Where more than an unlimited intrusion occurs, and "arrest", as opposed to a mere "detention" occurs, probable cause for the arrest is required.  An officer, without an arrest warrant, may not arrest a citizen for a crime unless he has probable cause to believe that the citizen in question has committed a crime.  *Kraus v. County of Pierce* 793 F.2d 1105, 1108 (9ᵗʰ Cir. 1986); *Dunaway v. New York* 442 U.S. 200, 99 S.Ct. 2248 (1979); California Penal Code Section 836.

**A.**     **The Starting Point for a the Determination of Probable Cause is**
          ***Franks v. Delaware* and the Alleged Material Misrepresentations.**

Under  *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a defendant in a criminal case may obtain an evidentiary hearing by making a substantial showing that a police officer, either knowingly or with reckless disregard for the truth, included a false statement in a warrant affidavit, and that the allegedly false statement was necessary to the finding of probable cause.  438 U.S. at 155-56, 98 S.Ct. 2674.[14]   If these allegations are proven by a preponderance of the evidence, the defendant has established a Fourth Amendment violation. *Id*. at 156, 98 S.Ct. 2674. See,  *Mendocino Environmental Ctr. v. Mendocino Co.*, 192 F.3d 1283 (9th Cir. 1999), fn. 21.

The Supreme Court and Ninth Circuit have made it clear that a officer who *recklessly or knowingly* includes false material information in, or omits material information from, a [] warrant affidavit "cannot be said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost." *Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir.1991) (internal quotation marks and citation omitted). "Thus [according to the Ninth Circuit] in order to survive a summary judgment motion

---

[14]The Supreme Court and Ninth Circuit have repeatedly held that the material misrepresentations or omissions can be either "knowingly or with reckless disregard for the truth."

(here it is a motion to dismiss) in a section 1983 case involving a *Franks* claim, Plaintiff need only 'establish a substantial showing of a deliberate falsehood or reckless disregard and establish that, without the dishonestly included or omitted information ... the affidavit is insufficient to establish probable cause.'" *Hervey v. Estes,* 65 F.3d 784, 789 (9th Cir.1995).  This is the same showing that is required to obtain a *Franks* evidentiary hearing in a criminal case.  *Id*. at 789.  In general, "the question of intent or recklessness is a factual determination for the trier of fact," and "[c]lear proof of deliberate or reckless omission is not required."  *Liston v. County of Riverside*, 120 F.3d 965, 974 (9th Cir.1997) (internal quotation marks and citations omitted).  *Mendocino*, at 1295.

Plaintiff's "*Franks*" theory alleges, in part, that Defendants made material misrepresentations and/or omissions to the judge in obtaining the "hold to answer" order  for Plaintiff on the reduced misdemeanor counts of False Imprisonment and Domestic Violence.  Officer Gonzales "testified" and "submitted reports" in the same way that an affiant for the procurement of a warrant "verifies" under penalty of perjury that the statements in the affidavit are true and correct.  The other Defendants, as alleged in the complaint, engaged in conduct to assist in the fraud.  Defendants and co-conspirators  approached the judge, through the District Attorney, in the same way that an affiant on a search warrant approaches a judge for  an order authorizing the warrant on a finding of probable cause.

The United States Supreme Court in *Malley v. Briggs*, 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986),  rejected the view that a police officer's reliance on a warrant is per se objectively reasonable merely because a judicial officer has found probable cause exists.  *Malley*, 475 U.S. at 345-46, 106 S.Ct. at 1098-99.  See also, *Bergquist v. County of Cochise*, 806 F.2d 1364, 1367-68 (9th Cir.1986).  The *Malley* Court recognized that under certain circumstances, it is possible that a magistrate will issue a warrant when one should not be authorized.  The Court put the burden on the officer applying for the warrant to minimize this danger by exercising

reasonable professional judgment. *Malley*, 475 U.S. at 345-46, 106 S.Ct. at 1098-99. Specifically, *Malley* denied absolute immunity to officers whose testimony served as the basis for obtaining an arrest warrant.

**B.** **Defendants Presented Purportedly Factual Information to the Magistrate Which Plaintiff Alleges Contained Material Misrepresentations and Omissions, i.e., Fraud.**

In this case, Plaintiff contends that defendants committed fraud at the Preliminary Hearing and the court refused to hold him to answer on the charges. In getting the court to allow the misdemeanor charge for Assault, the defendants committed fraud. Defendants were looking to falsely convict Plaintiff who they perceived as being a bad person because he was in the yard under such unusual circumstances. This investigation was further distorted by the fact that the parties completely changed their testimony from the Plaintiff not raising a bat or any other weapon to strike Hantsbarger, to both, changing the events by using "lie language" to contend that Plaintiff held the bat in a "batting stance" as a "baseball player as if he were going to hit a ball." The parties, both civilian and law enforcement, by their own unwitting admissions, that they knew Plaintiff did not commit an act justifying a probable cause finding so they changed their version of the events, identically, to justify the arrest. These facts establish that all facts, including that of fraud and misrepresentation, were not presented to the magistrate. Therefore, without all of the facts, including the lies of the witnesses, a fraud was committed on the magistrate.

The alleged fraud, by definition could not be tested at the hearing, for if Plaintiff had evidence of the fraud, he would have presented it. It was not until after the Preliminary Hearing that the defense was able to obtain the evidence corroborating the fraud; but, then, the prosecution dismissed the case. For example, discovery was obtained after the Preliminary Hearing and in the course of this case, including the statement of witnesses and parties along with the fraudulent statement of Travis Hantsbarger, which mimicked Officer Gonzales' false testimony.

The court made a finding of probable cause, it is alleged, because the witnesses' were lying.  Gonzales testified to what he said Hantsbarger told him.  That statement was a lie and a fraud.  The court, while being able to review Hantsbarger's statement on the night of the incident, which was substantially different from what Gonzales claimed Hantsbarger told him, it was not known that Hantsbarger and the Officer were allegedly colluding.

Moreover, it is alleged, Defendants made <u>material omissions and misrepresentations</u> about Plaintiff which led to the Assault misdemeanor.  These misrepresentations and omissions formed the basis for the procurement of the warrant for Plaintiff's arrest and ultimately for the Preliminary Hearing finding.  Specifically, the LAPD defendants made material omissions and misrepresentations when they failed to inform the court or the District Attorney that the statements to them by Travis Hantsbarger were fabricated (batting stance"), and that the statement of Travis Hantsbarger at the scene was not true. Again, this information was not learned until it was too late to present to the judge at the Preliminary Hearing to show fraud on the court.

Ultimately, the City Attorney's Office moved to dismiss the case because it was unable to proceed after it was pointed out that material misrepresentations and omissions were made by the defendants.

Correcting the material misrepresentations and filling in the material omissions, pursuant to *Franks*, would leave the testimony at the Preliminary Hearing with no factual basis to support a finding of probable cause. In other words, the fraud would be exposed, i.e., that all the defendants discussed their testimony, that they agreed to formulate a fraudulent description of Plaintiff's actions, and that Plaintiff never committed an act to warrant an arrest for trespassing or assault with a deadly weapon.

**C.      There Existed No independent Investigation by the District Attorney's Office into the Allegations of Corroboration.**

The prosecution, by definition, relied on the statements of the Defendants and

on their verified reports and on the Preliminary hearing testimony as to the alleged conduct of Plaintiff.  The prosecution could not and did not independently investigate, but relied on the defendants to file the case.

**2.     IMPORTANT FACTS OF THE FRAUD PERPETRATED ON THE COURT AND THE PROSECUTOR BY THESE DEFENDANTS.**

**A.     The Fraud Perpetrated on the Prosecution and Court by These Defendants Comes Under the Fraud Exception and Denied Plaintiff A Full And Fair Hearing.**

The City's statement that

> Defendant Hantsbarger's purportedly false statement was not offered at the preliminary hearing, and in fact, Defendant Hantsbarger did not testify at the hearing at all. Consequently, this purportedly fabricated evidence could not have had any influence on the court's finding of probable cause.

Moving Papers (Doc. 38) at 7:23-27.  This argument serves Plaintiff's point.  Plaintiff was unable to cross-examine Hantsbarger because he did not testify; defense counsel was unable to cross-examine the officers and Hantsbarger regarding the alleged fraud, fabrication, and misrepresentation, because he did not discover the information until later. The fact that Hantsbarger did not testify at the Preliminary Hearing, and the fact that the fraud was not discovered until later, deprived the court of evidence (of fraud) on the issue of probable cause and the credibility of the witnesses, and also showed that the issue was never fully and fairly litigated at the hearing.

Additionally, the argument that "those allegations ["LAPD Officers conspired with Defendant Hantsbarger to lie] are immaterial because they could not have had any bearing on the court's probable cause finding" sideswipes the collateral estoppel exception.  The moving parties argue that because the fraud was not exposed at the Preliminary Hearing, the finding of the judge was not affected (i.e., it is immaterial). This is an illogical argument.  The magistrate was deprived of relevant evidence of fraud and by omission. The issue, consequently, was not fully litigated.  Therefore, collateral estoppel does not apply.  Additionally, only a jury can decide if the alleged

fraud impacted the existence of probable cause.  One cannot legitimately argue that a probable cause finding is valid *because* any evidence of fraud was not presented at the hearing, and, thus, did not affect the hearing.  The omission of critical information on the credibility of the witnesses (perpetrating a fraud) is itself fraud, at least equal to the inclusion of misrepresentations.

A probable cause finding cannot be given preclusive affect when grounded on fraud or misrepresentation, (*McCutchen, supra, at* 1147).  The probable cause finding cannot be given preclusive affect when Plaintiff a "full and fair opportunity to litigate the issue in the prior proceeding." Moving Papers at 5:6-10 citing, *Haupt v. Dillard*, 17 F.3d 285, 288 (9th Cir. 1994) (questioned on other grounds) (citing *Allen v. McCurry*, 449 U.S. 90, 95 (1980).  It cannot be given preclusive affect, when the court dismissed the case based, in part, on lack of probable cause and on the merits.

**B.    The Fraud Perpetrated on the Prosecution and Court by These Defendants Was Not Litigated at the Preliminary Hearing Because the Fraud Was Hidden from the Defense, the Prosecution and the Court.**

At the Preliminary Hearing, Defendant Officer Gonzalez testified that Defendant Travis Hantsbarger told the officer that he walked into the yard and "there was a male crouched in the corner with a baseball bat. He stated that this male jumped up at him with a bat, taking a batting stance – striking stance."  This testimony is false.[15]  Officer Gonzalez was asked to describe in detail what Hantsbarger told him. Officer Gonzales testified: "He was crouched down on the ground, kind of huddled in a fetal position.  As Travis makes his way around the corner, this unknown male allegedly jumps up at him and takes "pretty much" a batting stance with the bat. Exhibit 2 (PHT) 29:23-27.[16]  The court asked Officer Gonzales:

---

[15]As will be seen from the video and audio interview of Travis Hantsbarger that evening, Hantsbarger never said any such thing.  Hantsbarger said that he saw Vernon Stratton on the ground and he got up saying something about a child.  Exhibit 2 (PHT), *infra*.

[16]Again, this testimony about what Travis Hantsbarger said was false.  Hantsbarger never said Vernon took a batting stance.  He said, I thought he was going to go for the bat (which wasn't even in Vernon's hands), so I hit him.  Exhibit 2 (PHT), *infra*.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> THE COURT:  Just so I am clear, it appears from what you're telling me, Travis told you that he has got the putter. He encounters this unknown male. The unknown male goes in to a crouch, holding a bat like he is going to be struck.
> THE WITNESS: Batting stance.

Exhibit 2 (PHT) 32:6-11.[17]  Officer Gonzales admits that <u>no where</u> in his report did her ever write that Travis Hantsbarger stated that Vernon Stratton jumped up and took a "batting stance" with the bat in preparation to strike or threaten Travis Hantsbarger. Exhibit 2 (PHT) 42:10-28:13.[18]

Although Defendant Hantsbarger's on-scene statement was provided to the court, he did not testify at the Preliminary Hearing.  Hantsbarger stated that Plaintiff never brought the bat up to hit him.  Exhibit 2 (PHT) 47:20-49:9. Counsel was not able to cross-examine Hantsbarger about his contacts with the police officer defendants, and probably would not have, since it was not known that the officers and Hantsbarger allegedly colluded and committed fraud and misrepresentation at that time. The reality is that the magistrate could not make a legitimate probably cause finding when the witnesses are lying, as alleged, and when what actually occurred is at issue.

It was not until after the Preliminary Hearing that the case was transferred to the City Attorney's office for prosecution of the misdemeanor.  During that time, the City Attorney's Office interviewed Hantsbarger where he "mimicked," i.e.,  repeated virtually verbatim, the false testimony of Officer Gonzalez.  Hantsbarger told the City Prosecutor, contrary to all other evidence, that Plaintiff "had the bat at his side and lifted it. He put it in position like a baseball player as if he were going to hit a ball." and Request for Judicial Notice therein.  This is virtually the exact same false language that Officer Gonzalez used in describing what Hantsbarger allegedly told him.  The statements that Gonzales and Hantsbarger made are alleged to be false and

---

[17]Again, this is totally false.

[18]Respectfully, during this cross-examination, the court continually interfered with counsel's cross-examination of the witness continually attempting to establish with the officer that Vernon "jumped up and took a batting stance."  Exhibit 2 (PHT) 40:4-28:20.

fabricated.  Moreover, the statements (Hantsbarger took a "batting stance" or positioned himself like a "baseball player as if her were going to hit the ball) are virtually identical and evidence of fraud and misrepresentation perpetrated on the court. Recall that Hantsbarger stated to the police at the scene that Plaintiff "

It is alleged, and Plaintiff has proof, that the Officers and Hantsbarger talked in court about the events, and both the officers and Hantsbarger made materially different, false, and identical statements about what allegedly occurred.  At the Preliminary Hearing, the court did not hear from Hantsbarger.  If the Preliminary Hearing were to occur again, the collusion and false statements of Hantsbarger and Officer Gonzales would have, it is alleged, have materially altered the finding of the court, since the testimony of the two witnesses, and defendants in this case, were materially false and not believable.

The complaint alleges that "it was pointed out to the prosecutors that HANTSBARGER gave a false statement to the prosecutor's office, which used the identical "lie-language" used by DEFENDANT GONZALEZ and SANCHEZ, the criminal charges against Plaintiff were dismissed.  The City prosecutors could not prove the case and there was no probable cause to justify the arrest and dismissed the charges."

Plaintiff has alleged facts sufficient to show that, if proven, could establish that the determination of probable cause is grounded on fraud or misrepresentation.  *See*, *McCutchen*, *supra*; Harris, *supra*.  Additionally, Officer Gonzalez also stated at the scene that "This appears to be a big misunderstanding."

Additionally, nowhere did Plaintiff, according to the Preliminary Hearing Transcript, do "an act that by its nature would directly and probably result in the application of force to a person."  Judicial Council Of California Criminal Jury Instruction 875.  Additionally, it is alleged, that Plaintiff cooperated with the instructions give to him by HANTSBARGER and BRITTON but was then brutally beaten, without reasonable justification."  Complaint at ¶ 14.  This allegation was

corroborated by discovery obtained in this case.  Regardless though, the version of Travis Hantsbarger as stated by the LAPD Defendant at the Preliminary Hearing is totally false and would have resulted in the rejection of charges had he not lied or conspired to lie with the LAPD defendants.

**C.    The Trial Court Ultimately Dismissed the Finding of Probable Cause When It Granted the Prosecution's Motion to Dismiss.**

It is alleged in the complaint that "it was pointed out to the prosecutors that HANTSBARGER gave a false statement to the prosecutor's office, which used the identical "lie-language" used by DEFENDANT GONZALEZ and SANCHEZ, the criminal charges against Plaintiff were dismissed.  The City prosecutors could not prove the case and there was no probable cause to justify the arrest and dismissed the charges."

Complaint at ¶¶ 15-21.  The fact that the probable cause finding was vitiated also defeats the basis of the moving parties' collateral estoppel motion.

**3.    THE DEFENDANTS ENGAGED IN MALICIOUS PROSECUTION IN VIOLATION OF THE PLAINTIFF'S CIVIL RIGHTS**

A plaintiff, who has suffered damage, loss or harm, as a proximate, legal result of an abuse of the legal process, including a malicious prosecution by a defendant, is entitled to recover damages from that defendant for such harm.  *Bretz v. Kelman* 773 F.2d 1026 (1985).  Malicious prosecution is the initiating or taking an active part in the procurement, the arrest of a plaintiff, and commencement or maintenance of a criminal proceeding against the plaintiff under lawful process but for malicious motives and without probable cause.  The standard is one of reasonableness.  *Usher v. City of Los Angeles* 828 F.2d 556 (9th Cir. 1987).  The constitutional claim for malicious prosecution is analyzed under the "reasonableness" or Fourth Amendment standard, not a Substantive Due Process analysis.  Id.

In this case, the Plaintiff was prosecuted in court was forced to endure the fear of the possibility of being convicted for something he did not do.  Further, the officers in the case continued with the prosecution until it was dismissed

**4.     THE STATE LAW CLAIMS ARE SUPPORTED BY THE EVIDENCE.**

Importantly, Plaintiff bases his claims on two theories.  First, Plaintiff asserts that the individual civilian defendants (Hantsbarger and Britton) had no right to strike, hit, beat him or spray him with mace.  However, even were they entitled to use some sort of force against him, these individual defendants were excessive in their beating of him, because they continued to beat him after he was disarmed and when there was no threat against them.  As a result of the beating, At Northridge Hospital medical Center he was found to have sustained Skull fracture, bleeding in the brain, facial fracture, fractured  right hand, fractured left ankle, missing teeth, and laceration to upper lip requiring 9 stitches.  He was taken in custody to LA County USC Medical Center where he underwent multiple surgeries.

Plaintiff sets forth the elements of each of the state law claims in the Pretrial Conference Order. At this point, however, if Plaintiff proves that the he was beat either unlawfully from the outset or in an  excessively brutal manner, his injuries certainly establish a battery, assault and infliction of emotional distress.  Negligence would be subsumed.

**EVIDENTIARY PROBLEMS**

The country and world are currently suffering under the COVID-19 pandemic. Some of the witnesses are not available because they are medical personnel or are susceptible to the virus.  Counsel is informed that the court is not calling jurors for jury service at this time and thus it is difficult to subpoena witnesses or make arrangements for testimony of witnesses.  Counsel submitted a stipulation to continue the trial to a date certain so that more certainty can be had with regard to witness scheduling.  The court denied that motion however.  Plaintiff, believes that all parties, based on meet and confer sessions, are equally affected by the uncertainty of the status of jury trials in the courts and the inability to subpoena for or advise witnesses and parties of a particular date for trial.

Plaintiff is currently investigating certain other aspects of this matter which may pose evidentiary problems; if so, these problems will be raised prior to the trial by motions *in limine* or otherwise.

## BIFURCATION OF ISSUES

The parties met and conferred on bifurcation and have concluded that bifurcation of any issues is not needed in this case.  The theory of plaintiff's case, the parties agreed, has a relatively small universe of facts that do not justify the bifurcation of liability from damages as the damages evidence is relevant to at least one of the theories of liability and the trial will not be unnecessarily extended by the damages evidence.

## JURY TRIAL

Timely demand for jury trial has been made by Plaintiff.

## ATTORNEYS' FEES

Plaintiffs will seek attorneys' fees and costs if they are the prevailing party.

DATED: October 9, 2020                    BELTRAN, BELTRAN, SMITH &
                                          MACKENZIE LLP


                                          By:  /S/
                                          _____
                                          PATRICK S. SMITH
                                          Attorneys for Plaintiff